MONCURR, P.
I think the Circuit court did not err in permitting the heirs of Henry Clarke to be made co-defendants in these suits, under the provision in the Code, chapter 135, $ 5, which provides that “if a lessee be made a defendant at the suit of a party claiming against the title of his .landlord, such landlord may appear and be made a defendant with or in the place of his lessee.” This privilege is given by law as well for the benefit of the landlord as of the tenant. The tenant has a right to be defended by the landlord, and the landlord has a right to defend his title whenever it is assailed by an action of ejectment against his tenant. This right of the landlord cannot be surrendered or prevented by any act of the tenant. The tenant cannot dispute the landlord’s title, but having received possession from him, is bound to restore it at the termination of the lease. The whole property in controversy in these two .suits was leased for eight years by Henry Clarke to Nicholas Riviera, a defendant in one of the suits, by deed dated the 14th dajr of January, 1852, A few days after the execution of this deed, to wit: on the 28th day of the same month, an agreement was entered into by and between R, D. and W. Mitchell (the former and assignee of the latter of whom are the plaintiffs in these suits), of one part, and the said Nicholas Riviera and Angelo Baratta, a defendant in the *other suit, of the other part, whereby it was, among other things, agreed that in the event the said Mitchells should establish their right to the said property, by a judgment or de *420 cree of any competent tribunal, then the said Riviera and Baratta should occupy the said property for the term of five years from the date of said agreement, at the annual rent of $300, which they were, in that event,' to pay to the said Mitchells. By an arrangement between Riviera and Baratta, the property seems to have been divided equally between them and held in severalty, and these suits were brought severally against them for their several portions. Riviera having become the tenant of Clarke by the deed of the 14th of January, 1852, did not and could not, by the subsequent agreement and arrangement aforesaid, prejudice the right of the latter as landlord or lessor, and his heirs had therefore the same right to be made defendants in the suit against Baratta as in the suit against Riviera. Indeed, those heirs are the only substantial defendants in the suits, and must have been contemplated as such in the agreement of the 28th of January 1852. The Mitchells were to establish their right by a judgment or decree. But against .whom? certainly not their own tenants, whom they could not expect to sue, except pro forma; but the adverse claimant, who was Clarke. As to there being no proof of the execution of the deed of lease, it was not denied by the plaintiffs, who resisted on other grounds the motion of the heirs of Clarke to be made defendants in the suits.
I am of opinion that the statement of the evidence, documentary and oral, copied into the records in these suits under the head of “cases agreed,” ought to be regarded as part of the said records by .this court, in reviewing the judgment of the Circuit court, although not made so by a bill of exception. The usual and regular *mode of making such matter a part of the record is by bill of exceptions, but it is not always the only mode. It may be embodied in the judgment, either verbatim, or by being referred to and identified therein as part thereof. In these suits the judgments recite that “the matters arising upon the pleadings, the statement of evidence and the deeds, plat, books and writings therein mentioned, agreed by the counsel for the respective parties, and by them submitted to the judgment of the court, being maturely weighed, it seems to the court, ’ ’ &c. ; and the statement under the head of “cases agreed,” immediately follows the judgments in the certified records before us. That statement affords unmistakable evidence that it was intended by 'the parties to be a part of the. records and to be so regarded in this court. It contains an express agreement that “Henning’s Statutes,”, and “Iddings’ map,” and “Bates’ map,” and “the plat made by T. M. Badd,” should be exhibited and used in the appellate court without being copied into the record. It is not pretended that the statement copied into the record is not the true statement referred to in the judgments, aiid a certiorari has not been applied for to complete or verify the record. This state-mént, though called in the records “cases agreed,” is not a case agreed in lieu of a special verdict, but merely a statement of evidence agreed by the parties to be read by the court on the trial of the issue between them, they having waived their right to have a jury and agreed that the whole matter of law and fact might be heard and determined, and judgment given by the court.
I am further of opinion that the settled general rule of practice, which requires a certificate of facts instead of evidence to enable an appellate court to revise a judgment of an inferior court upon a motion to set aside the verdict of a jury and grant a new trial, does not apply to a case in which the parties waive the right to have a *jury, and the judgment sought to be reviewed is that of the inferior court upon the whole matter of law and fact; in which case, as in every other case tried by a court upon the whole matter of law and fact, it is sufficient to make the evidence a part of the record, to enable an appellate court to revise the judgment.
My views upon this subject are fully set forth in the opinion of the dissenting judge in Pryor v. Kuhn, 12 Gratt. 615, and also in the opinion of Judge Daniel in Wickham, &c. v. Lewis, Martin & Co., 13 Id. 427, in which I concurred. I therefore think it unnecessary for me to say anything more on the subject, especially as my brother Rives, who I am glad to find entertains the same views, has fully and clearly set them forth in his opinion, in which part of it I entirely concur. I will repeat, however, that I consider the rule laid down in the case of Dudleys v. Dudleys, 3 Leigh 436, as the true rule which ought to govern the appellate court in all such cases; and I do not think the judgment of the court below ought to be reversed upon the ground that it is contrary to evidence unless it plainly appears to be erroneous, especially if the evidence or a part of it be oral, and more especially if there be a material conflict in such evidence. “The credibility of witnesses,” said Judge Cabell in that case, ‘ ‘depends on a variety of circumstances, which may be seen and .known by those who are present at their viva voce examination, but which cannot be transmitted through their written testimony to an appellate court. On a mere question of credibility, therefore, when there is nothing in the record to throw light on the subject, this court will always presume, that the inferior court, which saw and heard the witnesses examined, has decided correctly. ’ ’ Id. 441.
I am also of opinion that if the plaintiffs in these suits would have been entitled in a writ of right, at the time *the Code took effect and at the time : : ■ : of the institution of these suits, to recovei the land in controversy, if the Cpde had not been enacted, they are entitled to recover it in these actions of ejectment under the provisions in the Code, ch. 135, §§ 2 and 38, and ch. 149, (j 19. But the proceedings in any such action must of course be such *421 as are prescribed by the Code, whether the subject of controversy might have been recovered in an action of ejectment or could only have been recovered in a writ of right if the Code had not been enacted. While the right is saved the old remedy is abolished, with all the rules and principles which belonged to it, and a new one submitted to its place, with all the rules and principles which belong to the new remedy.
Having expressed these opinions upon the preliminary points arising in these cases, I now proceed to consider them upon the merits.
The plaintiffs claim the lot in controversy, by a long chain of title, under a grant to William Byrd, dated on the 20th of April, 1687, granting land bounded on the west by Shockoe creek, while the defendants seem to claim it under another grant to the same William Byrd, granting land bounded on the east by the same creek, though a copy of the latter grant is not in the record, nor do the defendants connect themselves therewith by any chain of title appearing in the record. The lot in controversy now lies on the east side of Shockoe creek, and the plaintiffs contend that it must be presumed to have been on that side at the time of the grant to Byrd under which they claim, or at least that it has been so long on that side, and there have been so many acts of the parties and others concerned fixing, or acquiescing in the present location of the steam, as to settle the rights of the riparian proprietors in the same manner as if it had always run as it now does. On the other hand, the defendants ^contend that the lot was formerly, and even during the present century, on the west side of the stream, which has since changed its course and thrown the lot on the east side; and that they and those under whom they claim have had actual possession of the lot, at least since the year 1815. The plaintiffs also contend that those under-whom they claim had possession, actual or constructive, from about the same time, or perhaps a short time before, down to the year 1839, since which time they seem to admit that the defendants and Henry Clarke, under whom they claim, have been in possession.
Beyond all question, the stream has changed its course, and the lot in controversy has been, at different times, on each side of it — and that within the memory of living witnesses, living at least at the time of the trial of these actions. That fact is attested by witnesses on both sides, such at least I consider the effect, if not the express language, of testimony on both sides. Two witnesses on the side of the defendants, Philip Courtney and Thomas Diddep, expressly say so. Thomas Diddep says that “in 1801-’2, the lot in controversy was west of the creek.” He seems to have been absent from the city from about that time until 1827, and therefore does not know when the lot ceased to be on the west side. jThe circumstances detailed by these two witnesses fully confirm this fact, and it seems also to be confirmed by the testimony of a witness for the plaintiffs, the surveyor Dadd. If there were a conflict of evidence on this question, we would still have to regard the fact as proved, if the rule I have before stated be the true one for our government in such a case, at least unless there was something in the record to turn the scale and clearly show the contrary. But there is indeed no such conflict of evidence. That the creek has changed its bed is a historical fact, proved in the case by an act of the legislature passed in May, 1780, *in which provision is made for improving the navigation of Shockoe creek, “either by turning the water into its old channel or by clearing the present channel.” 10 Hen. St. p. 319. Indeed, besides the oral evidence, the documentary evidence on the side of the plaintiffs as well as that on the side of the defendants, refers to or recognizes the fact of such a change. In the bill of John Adams filed in 1818, he bounds the land which he claims “by Shockoe creek as it now runs,” and by the line of “Shockoe creek, as the same may be established to have run.” A similar description is contained in the deed from Christian to John Adams, dated in the same year; in the deed from Page administrator of Byrd to Carrington administrator of Adams, dated the 26th of June, 1833; and in other deeds bearing date about the same time, in some of which the land is described as lying “on the east or lower side of Shockoe creek according to the ancient reputed course thereof. ’ ’ It appears from some of these deeds that John Adams claimed and held, and those deriving title under him, no doubt, yet claim and hold, a lot now lying on the west side of the creek; upon the ground that it was once on the east, and therefore embraced in the original grant under which they claim. The strong probability is that this stream, which has, been very liable to overflow its banks by freshets, has several times changed its bed since the date of the grant to Byrd, under which the plaintiffs claim; and it would now be impossible to ascertain where it was at that time, and whether the lot in controversy was then on the eastern or western side thereof. It cannot be said, therefore, that the plaintiffs, any more than the defendants, have shown a connected chain of title to the land in controversy from the original patentee down to the present time. The plaintiffs sa3r the land now lies on the east of the creek, and must therefore be presumed to have been there at the *time of the original grant. But it was not there in 1801 or 1802, certainlj', and perhaps down to a later period; and the presumption is at least as strong, if not stronger, that the stream was then in its natural bed, if it can be so called, as that it is now in such bed. Suppose, while the land was on the west side of the creek, James Downes, or Anderson under whom he claimed, had built a house upon the land, as being a part of the Palling Garden to which he was entitled and *422 which was bounded on the east by the creek, could the Adamses have recovered it of him without at least showing- that the creek formerly ran on the west side of the land and therefore probably ran on that side at the time of the original grant? I presume not. But surely it cannot affect the question of title to the land that a house was not built upon it as aforesaid, except so far as the building of such a house would be an act of possession which might by continuance ripen into a title.
The decision of these cases therefore, it seems to me, must depend, not upon a comparison of the relative chains of title of the parties, but upon a comparison of their claims arising from actual possession. Before we make this latter comparison it may be well to inquire when it was that the stream changed its bed from the eastern to the western side of the land in controversy? It is shown, I think, that the stream was on the eastern side, at least as late as 1801 or ’2, but not as late as the 22d of November 1808, the date of the deed from Anderson to Townes. The change took place between these two periods, but at what precise time does not appear. Probably it took place shortly before 1808, as Ladd states that as the period when he became acquainted with the property. He states facts which cannot well be reconciled with the location of the stream when he first knew it, on the west side of the land in controversy. The presumption therefore *is that he was mistaken as to time, and that his first acquaintance with the creek was before 1808. The witnesses, or some of them, seem to have been mistaken as to the cause of the change, which they refer to the building of the arch and bridge over Franklin street. That, no doubt, produced some change in the bed of the stream, but not so much as to throw it on the other side of the land, or even to any very material extent. The arch and bridge were constructed on Franklin street between the years 1814 and 1817, whereas the change in question seems to have been before 1808, as before mentioned. It is more probable that the witness Courtney referred the change to the true cause when he said, “the creek was turned westward by a bank thrown up in making Main street.-” When that bank was thrown up, or how long it was thereafter before the change took place, does not appear. He says the stone bridge on Main street was begun in 1795.”
Now let us compare the claims of the parties arising from actual possession. And, first, what are those of the defendants? In 1815 the possession of the land seems to have been vacant. On the 1st of August of that year, James Ijownes, to whom the Falling garden had been previously conveyed by Anderson; conveyed to his two sons William and Caleb Townes, by deed' which was duly recorded in the same month, land described as being a part of the Falling garden, lying between Shockoe creek as it then ran and the same creek as it ran at the period of the conveyance from Byrd’s trustees under which James Townes claimed title, embracing the land in controversy. The two sons, William and Caleb, seem to have taken immediate possession under the deed from their father; as we find they had a survey, map and division of the land, allotting the land in controversy, designated as lot No. 2, to Caleb, and another lot of precisely the same size *and form, designated as No. 1, lying- between No. 2 and the creek as it then ran, to William ; and deeds were interchanged by the brothers for their respective lots, which bear date on the 7th, of March, 1817, and were shortly thereafter duly recorded in the Hustings court of Richmond. Each of the brothers shortly thereafter executed a deed of trust upon his lot. The one executed by Caleb Townes bears date on the 10th day of June, 1819, was duly recorded in the same month, and is that under which the defendant Clarkes claim title as heirs of Henry Clarke, the surviving trustee in the deed. Wm. Townes and those claiming under him, have ever since the division been in possession of the land allotted to him; and so far from its being claimed by those under whom the plaintiffs claim, they refer to it in their deeds as the boundary of the land claimed by them. From the time of the execution of the deed to Caleb Townes down tojthe present time, he and those claiming under him seem to have had actual possession of the property, except between 1827, or there about, and 1839, during which interval it appears to have remained vacant, there being during that period no house upon it. Page testifies that in 1818 there was a house about the middle of the lot in controversy, then situated east of the creek, which had been formerly used by Caleb Townes as a carpenter’s shop, but in the said year was rented by him to two policemen as a stable. In a few years after 1818 the house went down, being exposed to freshets, and the people burnt it up. The place was almost a quagmire. The lot was used as a fish market while the house was there and afterwards. There were no fish benches, but some on the adjoining lot belonging.to Colonel Carrington. There was no attempt by Townes to disturb the fish market. Thomas Diddep testifies that there had been a hut on the property which was said to have been William Townes’, *who rented it to Frazier. Witness was made clerk of the market in 1827. Frazier was a police officer and put a black man who attended the cage in the hut, which witness thinks was removed somewhere about the time he was made clerk of the market. The hut spoken of by Diddep, was no doubt the house spoken of by Page, and seems to have been occupied by Caleb Townes and his tenants from 1818 to 1827. After that time we hear no more of the possession of Caleb Townes, probably not only because the house had gone down, but bé-cause the incumbrance by deed of trust on the property exceeded its value. But it was notorious that Henry Clarke, the surviving trustee, claimed the subject under *423 the deed. Whether he was connected in any waj' with John Clarke, the principal creditor provided for by the deed, or was in any way interested in the debt secured to him, does not appear. George M. Carring-ton, personal representative and a devisee of Richard Adams and a witness for the plaintiffs, testifies that when the sale was made in 1839, under the deed of trust from Adams to secure the Bank of Virginia, Henry Clarke was present and made no objection to the sale, at which the witness was surprised, for he knew that Clarke claimed it under a deed of trust from Bownes. The next morning when the witness went to market about sunrise, he found the lot now in controversy enclosed, and was told that it had been done by Henry Clarke. The witness had intended to buy it from the Banks, but after Clarke enclosed it he gave up all idea of the purchase, not wishing to buy a law suit. The knowledge of Clarke’s claim had not deterred witness from bidding for the property at the sale. Page proves that Clarke put up the enclosure in the night of the day on which the sale was made to the Bank. Prom that day, which was in July, 1839, until the present, Clarke and *those claiming under him have remained in actual possession of the land.
Such is the evidence of actual possession on the part of the defendants and those under whom they claim. What evidence is there of actual possession on the part of the plaintiffs and those under whom they claim? There is, I believe, but one witness who testifies as to such possession, and that witness is Colonel Carrington. He testifies that he has known the land in controversy since 1813 and perhaps earlier, and that Richard Adams was then in possession of it. And he says, in another place, that “the deed from Bownes to his sons was a paper affair, and no possession was taken under it. The land in controversy was in the possession of the Adams’s. They paid the taxes on it.” In regard to the deed from Bownes to his sons and the possession taken under it, I have already had occasion to remark. In regard to the possession of the Adams’s, of which the witness speaks, it is evident that he does not refer to any actual possession by them, but only to that constructive possession which arises from the legal title supposed by him to have been vested in the Adams’s. When he first mentions the subject of possession he connects it with the suit brought against Richard Adams by Byrd’s heirs, to which, by Chancellor Wythe’s order, the city of Richmond was made, a party, and to the compromise and deeds which grew out of that litigation. In this connection it may not be out of place to remark, that it seems to be at least very doubtful whether, until after the date of those deeds in 1833, the Adams’s had any title to any land between Shockoe creek and the western line of .the original city, which is said to have been 17th street; as by the act of May, 1742, for establishing the town of Richmond, all that land was dedicated by William Byrd, “as a common for the use and benefit of the inhabitants of the said town *forever. ” S Hen. St. 191. The deed from Byrd’s trustees to Adáms bears date after that act, to wit: on the 11th of December, 1761. This accounts for Chancellor Wythe’s order. The only evidence tending to prove actual possession of the lot by the plaintiffs or those under whom they claim is the statement of Carrington, that “in 1815 or 1816 the fish market, which had formerly been on the east side of Shockoe creek, between Main and Cary streets, where a flat rock was situated, which was used as a fish bench, and where country carts used to encamp, was moved to the lot in controversy by the permission of Richard Adams, who wished to build on the ground between Main and Cary streets. The fish market consisted of nothing but one or more benches, none of which were placed on the lot in controversy, but near it, and the fish carts used the said lot and fish were washed in the creek near thereto. The fish market remained there until the extension of the market building, which was probably a year or two after a condemnation of land in 1827,”. for the purposes of the market. The witness does not say that Adams gave any other permission than merely to acquiesce in this use by the fishermen of what he believed to be his property, but it must be confessed to be at most very slight, if any evidence of actual possession. The fisherman would be apt to occupy without permission, with their fishcarts, any vacant land near the market, and the owner would not be apt to object, especially if the land was a quagmire. But it seems that during most of the time the lot was so used, it was in the actual occupation of Caleb Bownes and his tenants, who themselves must have permitted such use. The sale of the lot in 1839 under the deed of trust for the benefit of the Bank, cannot be considered as evidence of actual possession. It does not appear that it was even made on the lot; though that fact is not material.
Can there be any doubt in this corn-parison of the evidence *of actual possession as to the side on which the scale preponderates? Can it be said that the judgment of the court below is plainly erroneous? I think not.
Several other topics were discussed in the argument which I intended to have noticed in my opinion; but it has already been extended much beyond my anticipation, and I therefore forbear to say more. Indeed, I can find no excuse for having said so much but in the great importance of the cases and the great ability with which they have been argued by the counsel on both sides.
I am of opinion to affirm the judgments.
RIVES, J.
These cases are identical in character and principle. They involve the same questions and depend on the same evidence. They are certainly not agreed cases, as they are termed in the respective records. Instead of being presented upon *424 an agreed state of facts, they were heard and decided upon contradictory testimony and the only agreement that was had, was to waive the jury and refer the matters of law and fact to the court for decision. This designation is, therefore, clearly incorrect, and can only be interpreted as loosely and inaccurately describing -the actual proceeding, which was one under the Code, ch. 163, § 9, p. 629. The error is rather nominal than material, ks the record displays with sufficient clearness the nature and authority of the proceeding. It is simply a case where the parties waive a trial by jury and submit the whole matter of law and fact to the judgment of the court. Regarding it as such, we are met- at the threshold of our inquiries by the question whether we can now act upon the evidence, instead of the certificate of facts usual upon exceptions, to the denial of a new trial; and whether we are to be governed by the principles applicable to such exceptions. The decision of this' court' upon this point in the case of Pryor v. *Kuhn, 12 Gratt. 615, was unsettled by the retra-xit of Judge Daniel in the' subsequent • case of Wickham and Goshorn v. Lewis Martin & Co.; 13 Gratt. 427; so that the court was then divided on the question, Judge Dee declining to express an opinion as unnecessary in his view of the case. This is a question of practice, important alike'to-the inferior and appellate courts; and' should not remain longer unsettled. . '
Wherever the- trial by jury occurs, there-is no room to confound the functions of the judge and the jurors; and necessarily Upon-all such • trials, questions of law alone, arising upon a certificate of facts,-Can ever reach the appellate tribunal. This, too, is highly desirable and expedient as a-general rule, for it is usually not fit that - such a court should weigh testimony and ascertain facts without the advantages attending- the personal examination of the witnesses. Nevertheless, there are other classes of." cases, such as appeals upon motions in chancery causes, upon questions of testamentary probates, in cases of mills, roads, ferries, &c., where the law has chosen ■ for other considerations to permit questions of -fact, as well as of law, to be carried up by appeal. Doubtless this arose from the nonintervention, of a -jury, in such cases and the absence of the appropriate -agency of- judge and jury in separating fact and :law, and eliminating the latter alone, to pass under the revision of .the appellate, court. The facts and. tfe?. lavv are in this-latter class so confounded in the .entire judgment pronounced upon both, -that no error in such judgment could be adequately - considered or corrected, unless- the evidence should accompany the appeal. While, therefore, the law and practice .under it, have clearly established this discrimination in the mode of giving and entertaining appellate jurisdiction in these two classes- of cases, the question- arises upon this charge, dispensing with a jury trial, *into which of these two categories should this new procedure fall; — into the- former class of-trial- by jury, or into the latter, where the court alone determined the matters of fact and law.' The necessary intendment and the inevitable conclusion seem to me to be that the legislature by this innovation took the case out of the former class and passed it to the latter; and as the president of this court aptly said in the case of Pryor v. Kuhn, that after this waiver of a jury, the case stood as'if.no such right of jury trial had ever existed; and the parties stood in relation to it as to all other cases where the whole question of fact and law was to be determined by the court. This follows from parity of reasoning; nor is-it a valid objection that the legislature has thereby inconveniently and injuriously enlarged the jurisdiction of this court over questions of evidence of difficult and embarrassing adjustment upon records. ■ That was a -fit consideration for the law maker; but is no-guide for the interpretation of the law when made. It is pertinent and material, however, to inquire of what avail 'would.an appeal be,-if in such a proceeding the court were to give the certificate of facts instead of the whole evidence. Every practitioner knows the embarrassment of placing his case in the light in which he views it, when he depends upon the judge’s certificate of facts proved before the jury;•but when the judge, instead of merely supervising the trial, becomes himself the’ trier, he ■ would be singularly gifted with impartiality and exempt from the ordinary infirmities of the mind, if his certificates were-not so imbued with his own prepossessions of the testimony as to render an •appeal wholly unavailing. Uet us take an1 illustration- from this case. Suppose the judge had certified it as a facf proved to his satisfaction, that under the plaintiff’s title-deeds, Shockoe creek followed the course of l7th street as some of the witnesses said it once did, it would have effectually *cut off the plaintiffs from all hope of success upon an appeal, and virtually converted their right into a sheer mockery. It will not do to object that this would be an abuse,- for it is quite proverbial —the-difference of ■ opinion upon conflicting- testimony and the vai'iety of conclusions from it; -so that a willful perversion cannot and ought not to be predicated of a judicial certificate of facts, however repugnant it may be to the belief of many or few. -The law, therefore, wisely provides, in the analogous cases; against such obstruction to the right of appeal; and this new proceeding,- under the Code, should now conform to the same principle. ■ While fully estimating the disadvantage of weighing and sifting testimony as it appears in a-record, apart- from the impressions and aids derived from a personal examination of witnesses, I am bound to accept it as a consequence of a resort to this court for the ascertainment of facts and law combined; and whatever vice adheres to the practice, affects equally the statutory appeals from *425 sentences not founded on verdicts. But these advantages are sensibly lessened by the manner in which this court deals with such appeals. Where conflicts exist or doubts arise upon the testimonjr, they are to be settled by deferring on these points to the judgment of the court that enjoyed the opportunities of testing the credibility and gauging the relative worth of the witnesses, thus insuring to the parties litigant in the last resort the original and unimpaired benefit of these guaranties of truth and justice in the oral examination of testimony. Dudleys v. Dudleys, 3 Leigh 436.
Por these reasons, I do not object that the whole mass of testimony has been brought up in this record. There is an irregularity, it is true, in failing to except to the final judgment, and thus procuring from the judge a more formal authentication of the evidence; but inasmuch as some indulgence should be extended to this new proceeding *under the Code, and the objection is rather technical and does not affect the merits, it seems to me better to entertain jurisdiction in this imperfect form, rather than incur the delay of sending it back to repair this fault.
Having thus sought to settle this preliminary question and to establish a rule of practice for the future, I come now to the merits of this controversy. I shall treat it briefly. In my view, I am relieved of the task of scrutinizing the testimony with the view of reconciling its contradictions or conflicts, if any exist. If I can find no uncontested facts to conduct my mind to a stable and satisfactory conclusion, if the testimony is contradictory on points material to the issue, and I can reach no decision except through doubtful disquisitions upon the weight of opposing evidence, then I am bound by the principles which I have announced, to concur in the judgment below. In such event, I need assign no other reason but that I entertain doubts and encounter conflicts of testimony that are to be solved in favor of the judgment appealed from. But if the foundations of an opinion adverse to that judgment can be found in prominent and undisputed facts, such a sentence would in nowise conflict with the authority that I impute to the original judgment, although upon minor and unessential points there might be a contrariety of evidence.
This action is to be interpreted as substituted for the writ of right, as the law stood before the introduction of this new remedy. It supersedes both the writ of right and the old action of ejectment; but as the latter, it would be barred in this case by the lapse of time from Clarke’s entry ; it is only as the former that the remedy is now preserved to the appellants. The rule of trial is very different in the two cases; in the former, the plaintiff must recover upon the strength of his title alone, and the defendant can defend himself by proving title in another; *but in the latter, a comparison of titles is had and the issue made as to which party has the better right to the tenement.
It will be conceded that the plaintiffs have made out an unbroken and perfect chain of title from Byrd’s patent in 1685 down to McMurdo’s deed of July the 16th, 1837, to the Bank of Virginia, under whom they claim. The question is one as to the western boundary of this grant. In Byrd’s patent it is declared to be “Shockoe creek, according to the meanderings thereof, ’ ’ and in the deed of Byrd’s trustees to Richard Adams of 11th November, 1761, the land conveyed is similarly described as “a parcel of land on the lower side of Shockoe creek, containing by estimation 831 acres. ’ ’ These deeds carried with them from this ancient period a constructive legal seizin, with which there has been no pretext of interference, as far as this record discloses, until the deed of 22d November, 1808, to James Downes, from Nathaniel Anderson, under which the ap-pellees claim. Anderson is said to have derived title from the same source with the appellants, namely, from' Byrd’s trustees; although, strange to say, the deed from the latter is not produced. Perhaps, it was not material, for it doubtless called for the same eastern boundary with Anderson’s deed to Downes, which described the Palling garden as “bounded on the east by Shockoe creek. ” These respective adversary and coterminous claimants are, therefore, disputing about the location of this stream. In this state of the case, the most conclusive evidence as against the appellees would be to fix this boundary in 1808 (when their claim originated), by the recognition and acts of James Downes.
It would be unreasonable and impracticable to require the appellants to locate this vagrant stream at the date of Byrd’s patent, or of the conveyance of his trustees in *1761, or at any period anterior to the memory of living witnesses. Nor does it matter, where it shall have been proven to be at the end of the last or beginning of this century, previous to the origin of the claim asserted by the appellees. But even if this were not so, it may be admitted that the course of this stream was, prior to this century, east of the lot in controversy ; yet, unless it can be further shown that it did not acquire its bed of 1808, by gradual and imperceptible accretions on its eastern side, but by a sudden change of its course, these riparian claims are fixed by the stream itself without reference to the gradual and imperceptible encroachments, year by year, in a long course of time, on the one side, with corresponding gains to the other. 2 Bla. Com. 262; Angel on Water Courses, p. 43. To make out the case of the appellees in this view of it, the aged witnesses should not only have proven this fluctuating boundary to have been about the year 1800, east of this" tenement, but that in the eight subsequent years this stream gained its bed, as recognized by James Downes, at that time, by sudden and violent irruptions, and not by those imperceptible changes which are adjudged to enure to the owner whose *426 borders are thus enlarged. I do not, therefore, think there is anything in the testimony as to the ancient -wanderings of this stream in conflict with the rights of the appellants to be ascertained at the date of James Townes’ deed of 22d November, 1808.. In the 'comparison of rights which this action contemplates, that period is the chosen one for adjusting the boundary between these parties. No sooner had James Townes acquired the Railing garden, than he proceeded with great dispatch to sell and convey the lots.into which he had divided it. A map was made, by which they were •sold. His first deed was dated on the day next after the date of his own deed from Anderson; and his deed to Prosser and Moncure *for the lot lying on Shockoe creek bears date the 1st March, 1809.
These were the deliberate acts of James Townes, the ancestor, , under whom the vendors of the appellees held; they have been yerified by a survey in this cause, and established beyond cavil his eastern boundary to be on the creek as it now is. Whatever, therefore, may have, been the course of this stream at an earlier period, James Townes’ deeds in 1808-’9 show .it then to have been co-incident with its present bed, and west of the tenement in controversy. This is documenatry evidence of no uncertain character; but of the highest authority for the settlement of this dispute. There is no fact or particle of testimony .in conflict with it; and it seems to. me impossible, in view of these conveyances, and the actual survey in accordance with them, to contradict their, tenor or evade their import by placing farther east the course of this creek as called for by James Townes’ deed of • 22d November, 1808.
After disposing of the last of these lost to Thomas Rutherford on the 28th of July, 1812, we hear nothing of James Townes’ claim east of Shockoe creek until August, 1815. ■ In the meantime, doubtless, it began to be bruited that this creek had changed its course so as to give room for speculation in floating, claims on the eastern side. James Townes did not then think proper to prefer a claim for himself; perhaps the matter was then too susceptible of adverse proof; but he devolves the speculation, whatever it might chance to be, at a more remote period, upon his sons William and Caleb. His deed, therefore, recites, cunningly enough, that “the said boundary in the course of time and events, and the channel of Shockoe creek, had been changed by the course of its waters, whereby a large space of ground formerly lying on the west margin of the bank of said *creek, is now situated on the eastern margin thereof,” and accordingly undertakes to convey “all that piece or parcel, pieces or parcels of ground, which are contained within the space from the western boundary of Shockoe creek as it now runs up to the western margin or boundary of Shockoe creek as. it formerly stood,” &c. At this date, Richard Adams was in the actual possession of this land, recognized as its owner, and as such impleaded by Byrd’s heirs and the City of Richmond in a suit which was terminated by compromise in the year 1818. This deed of Townes to his sons, then, was wholly inoperative in consequence of this adversary possession of Adams, and directly contravened the policy of the then existing law against pretence titles. It was void in its inception, and of no avail against parties seized both in law and deed. Tet it, therefore, be admitted that the sons made plats of this land and partitioned it by deeds between themselves; nay, further, that Caleb Townes erected and leased a hut on this ground in 1818, and received the rents therefrom; nevertheless, so long as such acts were without color of title, as I have endeavored to show them to be,- they were but the acts of trespassers or squatters, and could derive no validity from the efflux of time or any implication of acquiescence on the part of the rightful owner. They still remained wrongs, of which, it could only be said, the owner was perhaps ignorant, or if not, chose from some motive or other to submit to them.
Whose right, then, to this tenement is the better — that of the defendants, whose title deed of bargain and sale had no possession to convey to the use and was therefore void; or that of the demandants, who had actual as well as constructive seizin? The answer to the questions thus put is too apparent and inevitable to be stated. This speculation was not a fruitless one for William Townes; his claim seems to have been submitted *to, as the deed of Christian, commissioner, &c., called for his line; and it ripened into an undisputed title under Bolling’s trust deed.
It will be seen that the reasonings which have governed my view of these causes, have been limited to a- very few salient and decisive facts, of which there is neither doubt nor dispute. I have not, therefore, treated many questions raised by counsel, because I did not deem their solution necessary to this decisión.
While the disposition of these cases on their merits supersedes a decision upon the bill of exceptions to the admission of Clarke’s heirs as parties defendant, it may be well to say that I see no error therein.
I am, therefore, for reversing the judgments in these cases, and entering them for the appellants.