Christian, J.,
delivered the opinion of the court.
This is a case before us on a writ of error to a judgment of the circuit court of the city of Richmond. The action was detinue for ninety tierces of stearine in the possession of the Old Dominion Steamship Company, and claimed as the property of Durckhardt, a merchant resident in the city of Cincinnati. In the circuit court a jury was waived by the parties, and both matters of law and fact submitted to the court for its decision. The circuit court found in favor of the defendant in error (Durckhardt), and pronounced its judgment in his favor *666 against the plaintiff in error for the ninety tierces of stearine of the value of §3,382.67, if to be had, or the value thereof if not to be had, with interest on said value, to be computed after the rate of six per centum per annum, from the 2d day of May, 1876, until paid, and costs.
There was a demurrer to the declaration, which was afterwards withdrawn. The only plea tendered was non detinet, and on that issue alone the cause was heard and determined in the circuit court. A motion was made by the plaintiff in error to set aside the judgment and grant a new trial, which motion was overruled. A bill of exceptions, setting out the evidence, was tendered and signed and* sealed by the court. And thei’eupon the plaintiff’ in error applied to this court for a writ of error; which was accordingly awarded.
The question we have to determine is, was the judgment of the court upon the evidence appearing in the record before us erroneous ? And first, it is to be premised that the question as to how the appellate court will regard and give effect to a bill of exceptions in which the evidence and not the facts proved are certified, in a case tried by the court without a jury, and where the evidence is conflicting, is a question not definitely settled by the decisions of this court.
There is certainly some conflict of authority on this point. Some of the cases hold that the same rule is to be applied to a case where a jury is waived and the case is tried by the court upon the law and facts, as to a case where there is a verdict of a jury; and that in both cases where the evidence (and not facts proved) is certified, and the evidence is conflicting, the bill of exceptions must be taken as a demurrer to the evidence, and so regarding it, the appellate court will only reverse when it appears that by rejecting all the oral evidence of the plaintiff in error and giving full credit to that of the defendant in error, together with all fair and legal infer *667 enees to be dedpeed from said evidence, the judgment is erroneous. See Pryor v. Kuhn, 12 Gratt. 615, and Backhouse's ex'or v. Selden, 29 Gratt. 581; Hodges' ex'or v. First National Bank of Richmond, 22 Gratt. 61.
In Mitchell v. Barrada, 17 Gratt. 445, two judges out of three (the court then composed of three judges) held that a different rule prevailed where the judgment is by the court upon the law and facts; and it was so held also in Wickham & Goshorn v. Martin, Lewis & Co., 13 Gratt. 427, by two judges out of four.
According to these last-mentioned authorities, the rule in such case is different from that which prevails where there is a verdict of a jury; the hill of exceptions is not in such case to be regarded as a demurrer to evidence, but in case of a conflict of evidence in such a case, the preponderance will he given to that side which prevailed in the court below.
In the case before us, I do not think it necessary to reconcile these conflicting decisions and to declare which is the true rule settled by the weight of authority.
The question is not altogether free from doubt; it was not argued in this case, and its decision is not necessary to a determination of the controversy upon its merits; for, in my view, if we adopt either rule the result in this case will he the same. Adopting that rule which is most favorable to the defendant in error, and regarding the hill of exceptions as a demurrer to the evidence, I think it clear that the plaintiff in the court below was not entitled to recover, and that the judgment of the court below is erroneous.
In forming my judgment in this case, I will look alone to the evidence offered on behalf of the plaintiff in the court below, and so much of the evidence offered by the defendant as is not in conflict with the plaintiff ?s evidence. This evidence consists of the de *668 positions of Frederick Burckhardt (the plaintiff in the the court below), and of several of his employees, and also of certain teamsters and employees of the Cincinnati Transfer Company, who were engaged in transferring the stearine in controversy from Burckhardt’s factory to the wharf-boat of the Chesapeake and Ohio Railroad Company.
Burckhardt’s deposition was twice taken—the first on the 24th June, 1876, the second on the 19th October, 1876. He also testified in person before the court at the December term, 1876.
The question to be determined, upon the plaintiff’s evidence, and so much of the defendant’s as is not in conflict therewith, is, whether there was, on the 26th of April, 1876 (the date of the transaction out of which this suit originated), a sale by Burckhardt to Goettle Bros, of the ninety tierces of stearine in controversy, which, upon delivery, transferred the title to Goettle Bros., or whether there was simply a transfer of possession of the goods; in other words, whether the owner (Burckhardt) intended by that transaction to transfer both the property in and the possession of the goods to Goettle Bros., or to deliver nothing more than the bare possession. If the transaction was a sale which transferred both title and possession, although such title and possession was obtained by false and fraudulent representations by Goettle Bros., the goods cannot be recovered from Hall, the bona fide purchaser, who paid value for them without notice of such fraud, nor from the Old Dominion Steamship Company, which had the goods to be delivered to Hall. If, on the other hand, there was no sale which, upon delivery, passed the title, but it was intended to pass the bare possession only, then the sale by Goettle Bros, could pass no title to their vendee, and Burckhardt not having parted with the title, could claim *669 the goods in the hands of whomsoever they might he found.
To determine this question, let us look back to the deposition of Burekhardt taken on the 24th June, 1876.
After stating that he was a merchant who had been doing business in Cincinnati for thirty years in the firm-name of Burekhardt & Co., he is asked to state if he had any transactions with Goettle Bros, in respect to ninety tiei’ces of stearine in the latter part of April, 1876; if so, to state in detail what that transaction was. He answers this question as follows:
“Mr. Goettle, the one who is lame, Emil, I think his name is, asked me on ’Change, about the 23d or 24th of April, if we had any stearine; I told him we had some of off-grade on hand. He asked me then if I would lot him telegraph on it, and I said yea, he could telegraph. He asked then if he could send for samples, which were called for by some one from his office. On the morning of the 26th of April Mr. Emil Goettle called at my works and said that he had an order for the ninety tierces (there were two lots of which samples were given him) which he could use at eleven cents; eleven and one-quarter was the figure given by us when he got the sample. He requested to have fresh samples drawn from them, and he stood and examined the samples when they were drawn, and I said that eleven cents was the best that could be done and I would let it go at that. He said that we might have it weighed oft' as soon as convenient, which was done. In the afternoon of April 26th, the same day, during my absence from the store, he sent this paper which is hereto attached and marked exhibit Ho. 1, a copy of which is as follows: “ ‘ Messrs. Burekhardt & Co.:
“ ‘Please deliver to dray 90 trs. stearine and oblige
“ Goettle Bros.
“ ‘ Mark H-. April 26th, 1876.’
*670 “ He got the stearin e on this order, which was delivered to him by the employees at my store late in the afternoon; it must have been after two o’clock, for I was at the store then, and the order had not then come. After I went away I returned late in the afternoon, and then found it had gone.”
In answer to the question, “ State if the expression ‘ to telegraph on it’ is a term used in the trade in Cincinnati, and, if so, what it signifies ? ” he answered:
“Erokers and provision brokers confer with their principals in respect to goods that they order; it is a usual term with provision brokers on ’Change.”
In answer to the question, “ How and where was this stearme to be paid for, and what did the price come to ? ” he says:
“ It was to be paid for immediately on delivery; as soon as the goods are delivered it is expected that the money shall be paid by the brokers, or that they give their principals; the price came to $3,409.67 for the ninety tierces.”
In answer to the question, “ What w'as done about the payment of this stearine ? ” he says:
“ My collector went to Goettle, I think, in the evening of the 26th, or the following morning, to get the money; he came back and said that Mr. Goettle would see me on ’Change; I went there on’Change and could not find Mr. Goettle there; in the afternoon I sent again to his office and did not find him in, and came back without finding him. The following morning, the 28th, T sent, again, and he waited there, at Goettle’s office, until near ’Change, and told me that he could not get any money, and that Mr. Goettle would see me on ’Change again ; I met Mr. Goettle in front of the Exchange about 12 o’clock, ora little after; I demanded of him to pay for the stearine, or th*e bill of lading; he said he was sorry he could not pay it; I told him that he must either pay *671 for the goods, or return them or the bill of lading for them; that the goods were ours and I wanted the money for them. lie said that he had shipped them and against them; I asked him who they were shipped to; he gave me the name of Charles Hall of New York; I demanded of him the bill of lading, and he said that he 1 could not return it, as he had used it and drawn against it; I told him to give me the draft or else have the draft stopped from being paid; he assented to stop the payment of the draft and sent a dispatch, a copy of which is hereto annexed and marked exhibit ‘ 2,’ a copy of which I took at the time; his brother, while wTe were in conversation, came up to us and said that the draft was used in Kuhn’s hank, on Third street; I requested Mr. Goettle to go with me to Mr. Kittridge, my attorney, to determine what steps were necessary to protect us in our rights; the brother came with me; he agreed at Mr. Kittridge’s office to telegraph Mr. Hall to have the payment of the draft stopped; I also telegraphed, and a copy of the first dispatch is hereto attached, marked exhibit ‘3; ’ and after I saw Mr. Kittridge I again dispatched, a copy of which is hereto attached, marked exhibit ‘4”; I went to Mr. Kuhn’s office also to give him notice, and I told him that the stearine was our property, and that we should' follow it at once and replevy or attach it wherever we could find it. This all happened on April 28th, and I after — succeeded in stopping the stearine at Richmond.”
The telegrams referred to in the foregoing depositions are as follows, and were offered in evidence by the plaintiff:
Exhibit “ 2,” referred to in the foregoing depositions.
“ 28th Apl, 1876.
“ Chas. G. Hall, New York :
“Burckhardt & Co. claim and are entitled to proceeds ninety tierces stearine marked V. They telegraph you. [Signed] “ Goettle Bros.”
*672 Exhibit “ 3,” referred to in the foregoing depositions.
«Api. 28th, 1876.
«Chas. G. Hall, New York:
«We claim proceeds ninety trs. stearine shipped by Goettle Brothers. Dont pay d’ft.
“Burckhardt & Co.”
Exhibit “ 4,” referred to in the foregoing depositions.
« Chas. G. Hall:
« The 90 tierces stearine shipped by Goettle Bros. April 26th is ours. We have ordered the railroad company not to deliver it except on our order.
“Burckhardt & Co.”
Exhibit « 5,” referred to in the foregoing depositions.
“The Western Hnion Telegraph Company, 174 N. Y.; No. of message 456, dated- New York, April 28th, 1876. Received at N. W. cor. Fourth and Vine str., Cincinnati, 4 P. —.
“ To Burckhardt & Co.:
« Goettle Bros.’ draft on ninety tierces stearine paid and charged to their account.
« Chas. G. Hall.”
On cross-examination, in answer to the question whether at the time of the transaction the credit and standing of Goettle Brothers were good, he answered: “I knew nothing to the contrary.” He admitted also that he told his men to have the stearine weighed off for Goettle Brothers, and that the letter “ II,” directed to be mai’ked on the packages in the order for delivery, indicated that they were to be shipped.
*673 It was further proved by Frederick S. Cavally, the collecting clerk of Burckhardt, that he presented an invoice for ninety tierces of stearine on April 26th, 1876, tween three and four o’clock in the afternoon; that saw Mr. Emil Goettle, who stated that it was not all hauled at that time, and that he would hand Mr. Burckhardt a check on ’Change in the morning; that he called again on the morning of the 27th, when he saw Al. Goettle, and he promised that he would bring a check for the proceeds on ’Change on..the next morning; saw both the Goettles on the 28th, and both promised that the matter should be fixed up promptly. Witness was not present when sale was made. Heard Emil Goettle enquire for Mr. Burckhai’dt, and saw him and B. go together to the factory, where he presumes the sale was made. After Geottle left it was reported that the stearine was sold to Goettle Brothers.
It was further proved by the foreman of Burckhardt & Co. that he delivered the ninety tierces of stearine upon the order above referred to, signed by Goettle Brothers, to the wagons of Transfer Company, and placed the shipping mark upon the packages; that the last load was delivered when it was nearly four o’clock. This was the evening of the 26th of April, 1876. It was further proved by the teamsters who hauled the stearine to the wharf-boat of the Chesapeake and Ohio Railroad Company, that it was delivered on the afternoon of the 26th April. It was also proved by the clerk of the Transfer Company, that ninety packages of stearine wrere hauled by their wagons from Burckhardt’s factory to the wharf-boat of the Chesapeake and Ohio Railroad Company, and the drayage charged to Goettle Brothers.
The plaintiff' also testified before the court that on the evening of the 26th of April, on his return to the factory, about four o’clock P. M., he found that the stearine *674 had either been all just delivered, or nearly all delivered, and that he gave himself no further concern about the matter, as he knew he could not get the money that evening, it being after banking hours. He also testified that he knew the goods had been delivered from his factory for immediate shipment, and that the letter “H” on the order of Goettle Brothers was a shipping mark; that the stearine was charged on his books to Goettle Brothers, and the bill sent by his clerk for collection was made out against them.
It was further proved by the defendant’s evidence (and we may look to this because it is not in conflict with, but is corroborated in part by, plaintiff’s evidence), that Goettle Brothers took a bill of lading for the goods, and drew a draff on Charles G. Hall, of New York, to whom the stearine was shipped. “ The draft was for about ninety tierces of stearine, and called for between thirty-four and thirty-five hundred dollars” (the words of the witness are here quoted), and the draft was negotiated by Kuhn & Sons, brokers, in Cincinnati, who forwarded the draft with the bill of lading attached thereto, to said Hall at New York. It was paid by Hall before he had any notice of any claim on the part of Burckhardt to the goods. It is also proved that Goettle Brothers failed a few days after the transaction with Burckhardt.
Upon this evidence, I think, it is clear that on the 2Qth of April, the day of the delivery of the goods, there was a sale from Burckhardt to Goettle Brothers, which transferred to them the title as well as the possession of the goods, and that it was not the delivery of the bare possession which entitled Burckhardt to claim the goods in the hands of a bona fide purchaser without notice of Burckhardt’s claim.
On that day (the day of delivery) there was no enquiry of Goettle Brothers as to who were their principal, or whether they had a principal at all.. Burckhardt inferred *675 that they were acting as brokers for an unnamed, principal, because one of the Goettles enquired of him “ if he could telegraph” on the price fixed (11 cents), but was a mere matter of inference. If it was true, as Burckhardt says in his second deposition, that he would not have trusted Goettle Brothers, it is passing strange that before the delivery he did not make the same demand which he says he made on the 28th, that he should disclose the name of his principal on the 26th. On that day icho was he trusting, if not Goettle Brothers ? Certainly not an undisclosed principal, whose credit and whose name were both equally unknown to him. He says the sale was for cash on delivery. To whom was he looking for that cash ? To Goettle Brothers, or to some unknown and unnamed principal ? "What did it matter to him whether Goettle Brothers had a principal, or who was their principal, or whether that principal was known or not known, if his contract with them was “ cash on delivery ? ” In such a contract the delivering and the payment of the cash must be cotemporaneous acts, or the goods must be paid for before delivery.
"Why was not the cash demanded on delivery ? Burckhardt could have protected himself either by demanding cash before the goods were delivered, or seizing the goods before they left the Chesapeake and Ohio railroad wharf; or by demanding that the bill of lading should be delivered to him instead of Goettle Brothers. If he had intended to deliver the bare possession of the goods without transferring the title by making a sale, out and out, to Goettle Brothers, why did he charge the goods to Goettle Brothers, and send his clerk to them for payment ? He well knew that the packages, which were delivered from his factory on the order of Goettle Brothers, were marked for immediate shipment, and yet, knowing this, he permitted them to get out of his possession without being paid for. He was in his factory *676 when the last package was shipped, for he said when he returned about 4 o’clock on the afternoon of the 26th he found that the stearine had nearly been delivered, yet he took no steps to prevent its delivery, but charged the proceeds on his books to Goettle Brothers, and sent his clerk next morning to them to demand of ® them, not the stearine, which he now insists he had not sold to them, but the cash for the amount of the proceeds of sale. He did not see the Goettle Brothers until the 28th. It was then, he says, he pressed them ' either to have the goods, or an order for the goods or the money. It was then he demanded of them the nanqe of the party to whom the goods had been shipped, and being informed it was Chas. G. Hall, of New York, telegraphed to him “ we claim proceeds of ninety tierces of stearine shipped by Goettle Brothers. Don’t pay draft.” He was then informed that Goettle Brothers had sent the draft and bill of lading to Hall, and -that the draft had been negotiated by Kuhn & Sons, lie still claims the proceeds in his first telegram. It was after he saw his counsel that he sent the second telegram claiming the goods. . How, I think it is clear that the pretension of Burckhardt that he made no sale of -the stearine to Goettle Brothers, but only delivered the bare possession of,the goods to them as the brokers of an unknown and unnamed principal, and that therefore no title passed by delivery, is purely an afterthought, produced by the events which happened between the 26th of April, the day of the delivery, and the 28th, the day of the interview between Burckhardt and Goettle Brothers. In this interval the latter had failed; in this interval a bill of lading and draft had been negotiated and forwarded to Hall, paid by him, and charged to account of Goettle Brothers. In this interval counsel had been consulted, and then for the first time the goods claimed as the property of Burckhardt. When these important facts came to light on the 28th it is made *677 apparent that Burckhardt must suffer loss unless it can be shown that the delivery of the property was not a sale to Goettle Brothers, but only the delivery to them of bare possession, as the brokers representing an unknown principal, and that no title passed by the delivery. But in determining whether it was a sale and delivery which passed the title, it is plain we cannot be governed by these subsequent events, but by thefacts as they occurred on the day of the delivery of the goods. On that day, so far as the record shows, there was not a whisper of the insolvency or failing condition of Goettle Brothers. Indeed, the record shows that their failure was sudden and owing to unexpected failures of some of their customers in the South. And Mr. Burckhardt himself, in answer to the question, “At that time (April 26th), as far as you knew, was not their credit and standing good ? ” says: “ I knew nothing to the contrary.”
The transactions on that day (not affected by subsequent events) had all the constituent elements requisite to a sale and transfer of title. The pnce of the goods was .agreed upon between Burckhardt and Goettle Brothers. Ho enquiry was made if he was buying for a principal, and no principal, either known or unknown, was spoken of. The goods were delivered by Burckhardt on the order of Goettle Brothers, marked for immediate shipment. The goods were charged by Burckhardt on his books to Goettle Brothers, and Burckhardt’s collector applied repeatedly to Goettle Brothers for payment of the cash promised on delivery of the goods, and there is no hint that Burckhardt claimed title to the goods, or that there had been no sale to Goettle Brothers until after their insolvency had become known, and after the goods had come into the hands of a bona fide purchaser, who had paid for them without notice of Burckhardt’s claim, asserted by a telegram sent from his attorney’s office, in which he claims, two days after the *678 sale, that the goods are still his. I am, therefore, clearly opinion that, looking only to the plaintiff’s evidence, transaction between Burckhardt and Goettle Brothers on the 26th of April, 1876, was a sale, w'hich, on delivery, passed the title to the ninetj7 tierces of steariñe; and from that moment Goettle Brothers had a property in the goods, while Burckhardt had a property in the price. This being the case, and the goods having come into the hands of a bona fide purchaser from Goettle Brothers, it matters not whether they were obtained from Burckhardt by false pretences and fraud or not. It may he admitted that they were—and it certainly is not proved in the record that they were—and yet the title of Hall, to whom the goods were consigned by Goettle Brothers, who received the bill of lading and draft from them, and paid the draft without notice of Burckhardt’s claim, is not affected by the fraud of Goettle Brothers, even if it was distinctly proved.
"Whatever conflict of authority there may have been formerly upon the question, whether the property in goods passes by a sale which the vendor has been fraudulently induced to make, that question is now definitely and firmly settled by the more recent cases, both in England and in this country.
Mr. Benjamin in his admirable and accurate work on Sales says (§ 433, p. 394, ed. 1877):
“It is not until quite recently that it was finally settled whether the property in goods passes by a sale which the vendor has been fraudulently induced to make. The recent cases of Stevenson v. Newerham, in Exchequer Chambers, and Pease v. Glonhec, in the Privy Council, confirming the principles asserted by the Exchequer in Kingsford v. Murray, taken in connection with the decision in the House of Lords in Oakes v. Turquand, leave no room for further question. By the rules established in these cases, whenever goods are obtained from the *679 owner by fraud, we must distinguish whether the facts show a sale to the party guilty of the fraud or a mere delivery of the goods into his possession induced by fraudulent devices on his part. In other words, we must ask whether the owner intended to transfer both the property in and the possession of the goods to the person guilty of the fraud, or to deliver nothing more than the bare possession. In the former case there is a contract of sale, however fraudulent the device, and the property passes; but not in the latter case. This contract is voidable at the election of the vendor, not void ab initio'. It follows, therefore, that the vendor may affirm and enforce it, or may rescind it. He may sue in assumpsit for the price, and thus affirm the contract, or he may sue in trover for the goods or their value, and thus disaffirm it. But in the mean time and until he elects, if his vendee transfer the goods in whole or in part, lohether the transfer be of the general or of a special property in them, to an innocent third person for a valuable consideration, the rights of the original vendor xoill be subordinate to those of such innocent third person. If, on the contrary, the intention of the vendor was not to pass the property, but merely to part xvith the possession of the goods, there is no sale, and he who obtains such possession by fraud can convey no property in them to any third person, however innocent, for no property has passed to himself from the true ownei’.”
This doctrine has been well established by the American courts. It has' been affirmed and definitely settled by the decisions of the highest courts, certainly (if not in others) in New York,- Massachusetts, Pennsylvania, Maine, Maryland, Ohio, Illinois, Iowa, Wisconsin and Virginia. See note to §433, second American edition, and the numerous cases there cited. The same doctrine has been repeatedly affirmed by this court. In Williams v. Givin, 6 Gratt. 268, it was held that where the owner *680 of personal goods sells aurl delivers the same to a purchaser, a title to the property passes, though voidable and as between vendor and vendee, if obtained by false and fraudulent representations of the latter to ^ie i'W’T the former in regard to the consideration; in which case the vendor may reclaim his property from the vendee, but not from a bona fide purchaser from or under the vendee, for value paid without notice of the fraud. And this rule is not varied by the circumstance that the fraudulent purpose has been accomplished by the vendee’s knowingly paying the consideration in counterfeit money received by the vendor under the belief that it is genuine.
In Wickham & Goshorn v. Martin, Lewis & Co., 13 Gratt. 427, where an insolvent merchant purchased goods not intending to pay for them, and after fraudulently getting possession, conveys those goods with all of his other estate in trust for the payment of his debts, the trustee having no notice of the fraud, it was held that the trustee was a purchaser for value without notice. In that case Judge Samuels said: “If Gaft’ had bought the goods, knowing his own insolvency, or had industriously used devices to deceive the sellers, still Wickham & Goshorn, subsequent purchasers without notice, have a title better than that of Martin, Lewis & Co., the original sellers.”
In a recent English case, on appeal from the admiralty court, twice argued by very able counsel, the privy council, composed of Lords Chelmsford, Knight, Bruce and Turner, Lord J. J. and Sir E. V. Williams, by a unanimous decision, affirmed the following to be the true rule of law, viz: “Where a vendee obtains possession of a chattel with the intention by the vendor to transfer both the property and the possession, although the vendee has committed a false and fraudulent misrepresentation in order to effect the contract or obtain the possession, the *681 property vests in the vendee until the vendor has done some act to disaffirm the transaction; and the legal consequence is that if before the disaffirmance the fraudulent vendee has transferred, either the whole or a partial interest in the chattel, to an innocent transferee, the title of such transferee is good against the vendor.”
In Rowley v. Bigelow, 12 Pick. R. 307, Shaw, C. J., said : “We take the rule to be well settled that where there is a contract of sale and an actual delivery pursuant to it, a title to the property passes, but voidable and defeasible as between the vendor and vendee, if obtained by false and fraudulent representations. The vendor can therefore reclaim his property as against the vendee, * * * but not against a bona fide purchaser without notice of the fraud. The ground of exception in favor of the latter is, that he purchased of one having a possession under a contract of sale and with a title to the property, though defeasible and voidable on the ground of fraud; but as the second purchaser takes without fraud, and without notice of the fraud of the first purchaser, he takes a title freed from the taint of fraud.” In the case of Hall v. Hinks, 21 Mary. R. 406, a case singularly like this in all its features, Bartol, J., delivering the unanimous opinion of the court, speaking of the rule above referred to, says: “ The rule rests upon the well established principle of equity, that when one of two innocent persons must sutler by the fraud of a third, the loss shall fall upon him who has enabled such third person to do the wrong.” This case is so like the case under consideration, and the views of the learned judge so appropriate to this, that I extract still further from his able opinion: “ There can be no doubt, upon all the authorities, that consignees who bona fide advance money on consignments made to them upon bills of lading, acquire an interest in the property and are purchasers for value. *682 Persons so situated come within the definition of bona fide purchasers recognized in numerous cases.” In that case, as in this, it ivas earnestly urged that the sale was a conditional one, which condition ivas “ cask on delivery,” and therefore no title passed, because the condition to pay cash on delivery wras not complied with. In meeting this view, the learned judge says: “An examination of the authorities and a careful consideration of the subject have led us to the conclusion that the same rule applies; and that a bona fide purchaser without notice of the condition upon which his vendor has acquired the possession, will be protected against the claim of the original vendor in the same manner where the sale and delivery are conditional, as where the possession has been obtained by fraud. It seems to us that the same equitable principle lies at the foundation of the rule, and is equally applicable to both classes of cases. If a party purchase goods for cash, and they are delivered to him upon the condition that he shall pay for them on delivery, he perpetrates a fraud by selling them to another before complying with the condition; but if the person to whom he sells deals with him in good faith, ignorant of the-secret defect in his title, and pays value, it is difficult to see why, upon the principle before stated, the innocent purchaser ought not to be protected against the claim of the original vendor, who, by his own act, has enabled his vendee to pei’petrate the fraud. This view is consistent with the general current of authorities, and supported both by the adjudicated cases and the elementary writers.” And he cites a number of cases, with Kent’s Com. and Story on Sales, in support of this view. See, also, on this point, that the sale was on condition, Wait v. Green, 36 New York R. 556; Huffman v. Noble, 6 Metc. R. 68; Western Transportation Co. v. Marshall, 37 Barb. R. 509. *683 Without being committed to all the doctrines of that case, it is sufficient to say that both in that case and in this the sale was “ for cash on delivery; ” and when the goods were delivered marked for immediate shipment without the cash being paid contemporaneously or before the delivery, it must be taken that the vendor has waived the condition.
It would protract this opinion (already too long) beyond reasonable limits to review the cases relied on by the learned counsel for the defendant in error in the able and ingenious arguments submitted by them in support of the judgment in the court below. A careful examination of these cases will show that they do not militate against the principles established by the decisions of English and American courts above referred to; and that while in some of them there may be apparent conflict, I think even the few (modern) cases relied on can be easily reconciled upon the special facts and circumstances of these cases. There is certainly nothing in them to overthrow the principles established by the great current of English and American authorities.
I am of opinion, therefore, for the reasons herein stated, that Hall, the consignee of Goettle Bros., being a bona fide purchaser without notice, has acquired in the ninety tierces of stearine in controversy a title superior to that of Burckhardt; and that the judgment of the court below ought to have so determined. I am, therefore, for reversing the judgment and entering a judgment for the plaintiff in error.
The judgment was as follows:
The court is of opinion, for reasons stated in writing and filed with the record, that the judgment of the said circuit court is erroneous. It is therefore considered by *684 this court that the said judgment he reversed and annulled, and that the plaintiff in error recover against the defendant in error his costs by him expended in the prosecution of his writ of error and supersedeas here, together with his costs in the said circuit court. And this court now proceeding to enter such judgment as the said circuit court ought to have rendered, it is further considered by this court that the defendant in error take nothing by his hill in the said circuit court, and go thereof without day; which is ordered to he certified to the said circuit court of the city of Richmond.
Judgment reversed.